UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LAURI GORDON,<br><br>    Plaintiff,<br><br>       vs.<br><br>BANK OF AMERICA, N.A.;<br>SERERUS, INC.; FEDERAL<br>NATIONAL MORTGAGE<br>ASSOCIATON; JOHN DOES I-X,<br><br>    Defendants. | Civil Action No. 2:16-cv-03093-WJM-MF<br><br>Motion Returnable: December 19, 2016 |

## OPPOSITION OF DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT

Adam Deutsch, Esq.
Denbeaux & Denbeaux
366 Kinderkamack Road
Westwood, NJ 07675
(201) 664-9167
adeutsch@denbeauxlaw.com
*Attorneys for Plaintiff
Lauri Gordon*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT...................................................... 1

PROCEDURAL HISTORY......................................................... 1

STATEMENT OF FACTS......................................................... 3

LEGAL ARGUMENT............................................................. 7

I.    LEGAL STANDARD ON THE MOTION TO DISMISS BEFORE THE
COURT............................................................... 7

II.   PLAINTIFF'S CLAIMS ARE NOT BARRED BY PRECLUSIONARY
DOCTRINES OF LAW AS ALLEGED BY BANA........................ 9

    a. The Rooker Feldman Doctrine Does Not Apply to the Case
Before this Court........................................... 10

    b. The Doctrine of Res Judicata is Not Applicable as a
Bar to Plaintiff's Claims................................. 12

    c. The Doctrine of Collateral Estoppel is Not Applicable
as a Bar to Plaintiff's Claims........................... 13

    d. The Entire Controversy Doctrine is Not Applicable as a
Bar to Plaintiff's Claims................................. 15

III.  PLAINTIFF'S COMPLAINT SETS FORTH A CLAIM FOR RELIEF FOR
BREACH OF CONTRACT........................................ 18

IV.   PLAINTIFF'S COMPLAINT SETS FORTH A CLAIM FOR RELIEF FOR
BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING............................................................ 23

V.    PLAINTIFF'S COMPLAINT SETS FORTH A CLAIM FOR RELIEF FOR
VIOLATION OF THE CONUSMER FRAUD ACT..................... 26

VI.   PLAINTIFF'S COMPLAINT SETS FORTH A CLAIM FOR RELIEF FOR
VIOLATION OF COMMON LAW FRAUD........................... 34

VII.   **PLAINTIFF'S COMPLAINT SETS FORTH A CLAIM FOR RELIEF FOR VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT IN COUNT V OF THE COMPLAINT**...................................................   38

**CONCLUSION**.................................................................................................   44

## TABLE OF AUTHORITIES

**CASES**

*Allen ex rel. Martin v. LaSalle Bank, N.A.* 629 F.3d 364, 368 (3d Cir. 2011).............................................................................   40

*Ashcroft v. Iqbal*, 556 U.S. 662, 696 (U.S. 2009)   8,9

*Beals v. Bank of Am., N.A.*, 2011 U.S. Dist. LEXIS 128376, 47-50 (D.N.J. Nov 4, 2011)......................................................................   28

*Bell Atl. Corp. v. Twombly*, 550 US. 544 (2007)…   8

*Block v. Seneca Mortg. Servicing* 2016 U.S. Dist. LEXIS 150380 (D.N.J.. Oct 31, 2016)...........................................................   *Passim*

*Brown* 951 F.2d 564, 566 (3d Cir. 1991).................................   13,14

*Burlington N.R.R. v. Hyundai Merchant Marine Co.,* 63 F.3d 1227 (3d Cir. 1995).............................................................................   13

*Codgdell v. Hosp. Ctr. At Orange*, 116 N.J. 7 (N.J. 1989)............................................................................................   16

*Cramer v. General Tel. & Electronics Corp.*, 582 F.2d 259, 266 (3d Cir. Pa. 1978)....................................................................   12

*Douglass v. Convergent Outsourcing*, 756 F.3d 299, 303 (3d Cir. 2014).............................................................................   38,39,41

*Elkadrawy v. Vanguard Grp., Inc.*, 584 F.3d 169, 172 (3d Cir. 2009).................................................................. 12

*Exon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)......................................................... 11

*Evankavitch v. Green Tree Servicing, LLC* 2015 U.S. App. LEXIS 12024 (3d Cir. July 13, 2015)...................... 39

*Fields v. Thompson Printing Co., Inc.*, 363 F.3d 259, 266 (3d Cir. 2004)......................................................... 17

*Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007).................................................................. 18

*Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (N.J. 1997).................................................................. 34

*Giordano v. Saxon Mortg. Servs., Inc.*,  2014 U.S. Dist. LEXIS 137703 (D.N.J. Sep 29, 2014)......................... *Passim*

*Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557, 576 (2011).................................................................. 26,27

*Graham*, 973 F.2d 1089, 1097 (3d Cir. 1992)............... 13

*Indian Brand Farms, Inc. v. Novartis Crop Prot., Inc.*, 617 F.3d 207, 210 (3d Cir. 2010)......................... 34

*Jensen v. Pressler & Pressler* 791 F.3d 413, 421 (3d Cir. 2015).................................................................. 40

*Jubelt v. United Mortg. Bankers. Ltd.*, 2015 U.S. Dist. LEXIS 84595 (D.N.J. June 30, 2015)............................ 29,32

*Kalogeras v. 239 Broad Ave., LLC* 202 N.J. 349 (N.J. 2010).................................................................. 26

*Kapossy v. McGraw-Hill*, 921 F.Supp. 234 (N.J.D.C. 1996).................................................................. 24

*Kaymark v. Bank of America, N.A.* 783 F.3d 168, 174 (3d Cir. 2015)........................................................................ 40,44

*Langley v. Statebridge* 2014 U.S. Dist. LEXIS 176266 (D.N.J. Dec. 16, 2014)........................................................... 41

*Laughlin v. Bank of Am., N.A.*, 2014 U.S. Dist. LEXIS 79441, 14 (D.N.J. June 11, 2014)........................................ 27,28

*Lemelledo v. Benefit Mgmt. Corp.*, 150 N.J. 255, 264 (1997)..................................................................................... 26

*Lesher v. Law Offices of Mitchell N.Ka, P.C.*, 650 F.3d 993, 996 (3d Cir. 2011)...................................................... 39

*McClellan v. Carland*, 217 U.S. 268, 282 (1910)…     11

*Neitzke v. Williams*, 490 U.S., 319, 327 (1989)…     9

*New Jersey Citizen Action v. Schering* 367 N.J. Super. 8, 12-13, 842 A.2d 174 (App. Div. 2003)............................ 26

*Ricketti v. Barry* 775 F.3d 611, 613 (3d Cir. 2015)     16

*Rycocline Prods., Inc. v. C&W Unlimited*, 109 F.3d.883, 886 (3d Cir. 1997)............................................................. 15

*Sarlo v. Wells Fargo Bank, N.A.* 2015 U.S. Dist. LEXIS 36358 (D.N.J. March 23, 2015)...................................... 16,23

*Schuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974)........................................................................... 8

*Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 264 (3d Cir. 2013)........................................................................... 8

*Sons of Thunder, Inc. v. Borden, Inc.* 148 N.J. 396 (N.J. 1997)................................................................................ 24

*Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 192 (3d Cir. 2006)................................................................... 10-11

*Thiedmann v. Mercedes-Benz USA, LLC* 183 N.J. 234, 246-52, 872 A.2d 783 (2005)..................................................................... 33

*Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992)...................................................................................... 18

*Whiteford v. Reed*, 155 F.3d 671, 674 (3d Cir. 1998)   11

*Wilson v. Hess Corp.*, 773 A.1121, 1130 (N.J. App. Div. 2001)...................................................................................... 25

*Wood v. New Jersey Mfrs. Ins. Co.*,206 N.J. 562 (N.J. 2011)...................................................................................... 24,25

## STATUTES AND REGULATIONS

15 U.S.C. §1692a(2).................................................... 41,44

15 U.S.C. §1692a(3).................................................... 39

15 U.S.C. §1692a(6).................................................... 40

15 U.S.C. §1692c.......................................................... 43

15 U.S.C. §1692e.......................................................... *Passim*

28 U.S.C. §1331............................................................ 7

28 U.S.C. §1332............................................................ 7

N.J.S.A. §§ 56:8-1....................................................... 26,27

N.J.S.A. 56:8-2............................................................. 27

**RULES**

Fed.R.Civ.P. 12(b)(1)..................................................................  *Passim*

Fed.R.Civ.P. 12(b)(6)..................................................................  *Passim*

N.J.Ct. Rule 4:30A......................................................................  16

N.J.Ct.R. 4:64-5..........................................................................  10,16

## PRELIMINARY STATEMENT

The motions before the Court to dismiss Defendant's complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) must be rejected and the case permitted to proceed on the merits.  The Complaint sets forth sufficient facts and allegations to surpass the minimum pleading standards and satisfy Fed.R.Civ.P. 12(b)(6).  Defendant's Fed.R.Civ.P. 12(b)(1) jurisdictional arguments that the claims are precluded have no basis in law or fact and are presented as a distraction from the merits of the case.  The jurisdictional argument alleges that Plaintiff's claims are barred by virtue of a separate foreclosure lawsuit. The factual record will show that the foreclosure has been dismissed with no final judgment being obtained, and no enforceable interlocutory orders existing.  The law will show that New Jersey's foreclosure jurisprudence has a very limited joinder rule, favoring that parties bring affirmative claims for fraud, and breach of modification protocol in separate lawsuits. Accordingly, Plaintiff's claims should be permitted to proceed at this time.

## PROCEDURAL HISTORY

Plaintiff Lauri Gordon filed the complaint commencing this litigation on May 31, 2016 bringing three causes of action under Breach of Contract, New Jersey Consumer Fraud Act and the Fair Debt Collection Practices Act. [ECF 1]  On August 15, 2016

1

Plaintiff filed a First Amended Complaint adding causes of action for Common Law Fraud, and Breach of Duty of Good Faith and Fair Dealing. [ECF 19]  On September 21, 2016 Defendant Bank of America moved for dismissal of the First Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). [ECF 22]  On September 21, 2016 Defendants Seterus, Inc. and Federal National Mortgage Association ("Fannie Mae") moved for dismissal of the First Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6).

As referenced in the Complaint and First Amended Complaint as well as the Motion to Dismiss Briefs of Defendants a separate lawsuit was filed by Bank of America, N.A. on May 19, 2014 seeking to foreclose on Plaintiff's mortgage loan under New Jersey docket F-019812-14. [ECF 19 ¶73].  On September 2, 2016 New Jersey State Court issued a warning that the foreclosure lawsuit would be dismissed for lack of prosecution on or about October 2, 2016 unless Bank of America, N.A. took specified action to enforce the lawsuit. [Certification of Adam Deutsch ¶--]  On October 7, 2016 the New Jersey State Court entered an Order dismissing the foreclosure lawsuit. [Certification of Adam Deutsch: **Exhibit 1**]  As of the filing of this brief, there is no active foreclosure litigation against Plaintiff Lauri Gordon and no state court judgment of foreclosure has been obtained.

<u>**STATEMENT OF FACTS**</u>

Plaintiff owns and resides in the real property that is the subject of this litigation. [ECF 19 ¶3]   In February 2007 Plaintiff entered into a refinance mortgage loan agreement with Premier Bank. [ID ¶39]   After the loan closed it was sold to Fannie Mae and servicing of the loan was transferred to Bank of America, N.A. ("BANA") [Id. ¶¶40-42]   As servicer of the mortgage loan BANA acted on behalf of Fannie Mae. [Id. ¶43]

In 2009 Plaintiff suffered an economic hardship. [Id. ¶44] To avoid defaulting on the mortgage loan Plaintiff sold personal property and liquidated her retirement savings. [Id. ¶45]  While liquidating her retirement savings, Plaintiff proactively contacted BANA to seek loss mitigation assistance. [Id. ¶46]

In or about September 2009 an employee representative of BANA told Plaintiff by phone that loss mitigation options would only become available to Plaintiff if she defaulted on the mortgage loan. [Id. ¶47]   Relying on the instructions of BANA Plaintiff did not make the mortgage loan payment due October 1, 2009, November 1, 2009 and December 1, 2009.  [Id. ¶49]  On or about that same time Plaintiff submitted a loss mitigation application to BANA. [Id. ¶50]

In or about December 4, 2009 BANA told Plaintiff by phone that in order to be eligible for available loss mitigation programs she had to make a one-time payment of $2,956.10. [Id.

3

¶52] Plaintiff made a one time payment payable to "BAC Home Loans Servicing LP" in the amount of $2,956.10. [Id. ¶53] Soon thereafter on or about December 18, 2009 Plaintiff received a phone call from BANA confirming that she was approved for a trial loan modification requiring three monthly payments of $1,614.17 commencing February 1, 2010. Id. ¶54. During the December 18, 2009 phone call BANA told Plaintiff that her check in the amount of $2,956.10 had not been received and demanded that Plaintiff send a second check in the same amount. Id. ¶55. Acting in reliance on BANA's representation, Plaintiff sent a second check in the amount of $2,956.10. [Id. ¶56] BANA deposited both of Plaintiff's checks in the amount of $2,956.10. Id. ¶57.

In late December 2009 BANA provided Plaintiff with a written Home Affordable Modification Program Trial Period Plan ("HAMP TPP"). Id. ¶58. The Trial Modification Agreement States:

> If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the mortgage.
> . . .
>
> 1. My Representations. I certify, represent to Servicer and agree:

4

A. I am unable to afford my mortgage payments for the reasons indicated in my Hardship Affidavit and as a result, (i) I am either in default or believe I will be in default under the Loan Documents in the near future, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

B. I live in the Property as my principal residence, and the Property has not been condemned;

C. There has been no change in the ownership of the property since I signed the loan documents;

D. I am providing or already have provided documentation for all income that I receive (and I understand that I am not required to disclose any child support or alimony that I receive, unless I wish to have such income considered to qualify for the offer);

E. Under penalty of perjury, all documents and information I have provided to Servicer pursuant to this Plan, including the documents and information regarding my eligibility for the program are true and correct; and

F. If servicer requires me to obtain credit counseling, I will do so.

[ECF 19 ¶60]

Plaintiff signed the HAMP TPP and returned it to BANA in the manner and time required. Id. ¶61. Plaintiff made each of the three payments required by the HAMP TPP. Id. ¶63-64. Plaintiff met all conditions of the HAMP TPP and her financial circumstances did not materially change during the period of the HAMP TPP. Id. ¶65 Plaintiff made an additional three payments in the amount of $1,614.17 to BANA in May, June and July 2010. Id. ¶68. In total Plaintiff paid BANA $15,597.22 in connection with the HAMP TPP.

Despite Plaintiff's complete compliance with the HAMP TPP BANA refused to provide Plaintiff with a permanent loan modification. Id. ¶69. By letter dated June 3, 2010 BANA wrote to Plaintiff:

> We have reviewed your request for a loan modification under the federal government's Home Affordable Modification Program. Unfortunately, your loan is not eligible for a Home Affordable Modification for the reason stated below:
> ……
>
> **Excessive Forbearance.** Your loan is not eligible for a Home Affordable Modification because we are unable to create an affordable payment equal to 31% of your reported monthly gross income without changing the terms of your loan beyond the requirements of the program. In other words, to create an affordable payment for you, the investor (owner) of your loan would be required to delay collecting too large a portion of your principal balance until the loan pays off, beyond what the Home Affordable Modification Program allows.
>
> [Id. ¶70]

The basis for denial "Excessive Forbearance" is not a basis for denying Plaintiff a Permanent Modification under the terms of the HAMP TPP. Id. ¶72.

On May 19, 2014 BANA filed a foreclosure lawsuit in New Jersey Superior Court under docket F-019812-14. [Id. ¶73] On February 20, 2015 New Jersey Superior Court entered an interlocutory order striking Lauri Gordon's contesting pleading in the foreclosure litigation. [ECF 22-4 p15] On October 7,

2016 the foreclosure lawsuit was dismissed without prejudice pursuant to an Order entered by the Superior Court of New Jersey. [Certification of Adam Deutsch **Exhibit 1**].  As of October 7, 2016 there is no active foreclosure lawsuit.  At no time was a final judgment in foreclosure entered.

## <u>LEGAL ARGUMENT</u>

### I.   **LEGAL STANDARD ON THE MOTION TO DISMISS BEFORE THE COURT**.

Defendants move before the Court for dismissal of the Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6).

Federal Rule of Civil Procedures 12(b)(1) requires dismissal of claims where the District Court lacks subject matter jurisdiction.  This Court has jurisdiction to hear the claims brought by Plaintiff pursuant to 28 U.S.C. §1331 because Count V of the Complaint is based upon a federal statute. Alternatively, the Court has jurisdiction pursuant to 28 U.S.C. §1332 based upon diversity of the parties and the amount in controversy exceeding $75,000.

In support of the Fed.R.Civ.P. 12(b)(1) argument, Defendant incorrectly claims that Plaintiffs causes of action are barred by the Rooker-Feldman doctrine.  The argument is based upon the mistaken belief that Plaintiffs' claims effectively seek review of judicial decisions rendered by the State Court of New Jersey. Discussed in detail in section II of this brief, that doctrine

does not apply. The underlying state action referenced by Defendant was dismissed by the New Jersey State Court on October 7, 2016 without ever reaching a judgment or other resolution on the merits. Because that matter was dismissed and has no binding authority on the parties, application of the Rooker Feldman doctrine cannot apply. Under the applicable standard, this Court retains subject matter jurisdiction on this case.

The legal standard for a motion to dismiss under Fed.R.Civ.P. 12(b)(6) is well settled and straightforward. The purpose of the motion to dismiss is to test the sufficiency of the complaint. *See Schuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974). In doing so the Court is to follow the legal standard set forth by the U.S. Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 US. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (U.S. 2009).

Under the standard, the Court is to treat all allegations in the complaint as true and to view them in a light most favorable to the claimant. *Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 264 (3d Cir. 2013). Motions to dismiss brought pursuant to Fed.R.Civ.P. 12(b)(6) may only be granted if a court finds the Plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 US. 544, 555 (2007). The Court is not charged with the duty to determine whether the claimant is

likely to ultimately prove its legal claims, instead the claimant must be permitted to proceed so long as the allegations if proven *could* result in establishing liability. *See Ashcroft v. Iqbal*, 556 U.S. 662, 696 (U.S. 2009) (*citing Neitzke v. Williams*, 490 U.S., 319, 327 (1989)).

Reviewing the Complaint and assuming all facts to be true, there is no question that Plaintiff's claim for relief is viable under the Fed. R. Civ. P. 12(b)(6) standard. Plaintiff has set forth the factual basis for the claim with citation to the applicable statute(s). Accordingly, the Court should deny motions of the several defendants so the case may proceed on the merits.

## II. PLAINTIFF'S CLAIMS ARE NOT BARRED BY PRECLUSIONARY DOCTRINES OF LAW AS ALLEGED BY BANA.

Section II of BANA's legal brief argues that Plaintiff's First Amended Complaint should be deemed barred pursuant to the Rooker-Feldman Doctrine, the Doctrine of Res Judicata, the Doctrine of Collateral Estoppel, and the Entire controversy Doctrine. Defendant's arguments are built upon inaccurate assertions of fact. There are two key reasons the preclusion doctrine arguments must fail. (1) The New Jersey Superior Court foreclosure lawsuit under state docket F-019812-14 was dismissed on October 7, 2016 without a final judgment having ever been obtained. None of the interlocutory orders entered in that case

are binding on the parties following dismissal and there can be no preclusive effect to the state court action. (2) Contrary to the arguments of the Defendants, none of the affirmative claims in this litigation were subject to mandatory joinder. N.J.Ct.R. 4:64-5.

### a. The Rooker Feldman Doctrine Does Not Apply to the Case Before this Court.

The litigation before this Court is the <u>only</u> open cause of action before any state or federal court concerning the mortgage loan contract described in paragraph 39 of the First Amended Complaint. There has never been a judgment or other order of final resolution entered in relation to the mortgage loan or real property financing transaction that are at the heart of this litigation. On October 7, 2016 the state court litigation that previously proceeded parallel to this action under New Jersey docket F-19812-14 was dismissed without prejudice by the state court. Defendant's argument that the claims in this case are barred by the *Rooker-Feldman* Doctrine must be rejected because the jurisdictional doctrine only applies if the moving party can first demonstrate the existence of a state court judgment.

The *Rooker-Feldman* Doctrine precludes district courts from exercising jurisdiction over a claim if the relief requested would reverse or void a state court judgment. *Taliaferro v.*

*Darby Twp. Zoning Bd.,* 458 F.3d 181, 192 (3d Cir. 2006) (citing *Whiteford v. Reed*, 155 F.3d 671, 674 (3d Cir. 1998)).   The United States Supreme Court has explained that application of the doctrine is extremely narrow and reserved for "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. *Exon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005).   Defendant does not claim the existence of a state court judgment because none exist.

Application of the *Rooker-Feldman* Doctrine does not prohibit parallel state and federal litigation.   "When there is parallel state and federal litigation, *Rooker-Feldman* is not triggered simply by the entry of judgment in state court." *Exon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292 (2005). The Supreme Court has repeatedly held "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." Id. (quoting *McClellan v. Carland,* 217 U.S. 268, 282 (1910).)   Thus, even if the state court litigation were currently active but not at final adjudication, the *Rooker-Feldman* Doctrine would not apply.[1]

---

[1] Defendants argue incorrectly that the *Rooker-Feldman* Doctrine applies in this case by virtue of the February 20, 2015 Superior

b. **The Doctrine of Res Judicata is Not Applicable as a Bar to Plaintiff's Claims.**

The doctrine of res judicata is not applicable to the case before the Court.  As defendant explains in its brief, Res Judicata applies when there has been "(1) a final judgment on the merits in a prior suit; (2) involving the same parties or their privies; and (3) a subsequent suit based on the same cause of action." *Elkadrawy v. Vanguard Grp., Inc.*, 584 F.3d 169, 172 (3d Cir. 2009).  The purpose of the doctrine is to preclude a court from disturbing a judgment on the merits "in a subsequent suit involving the same parties." *Cramer v. General Tel. & Electronics Corp.*, 582 F.2d 259, 266 (3d Cir. Pa. 1978)

By definition of the doctrine, Res Judicata does not apply where no final adjudication has occurred.  The prior lawsuit relied upon by Defendant is the state court foreclosure action

---

Court of New Jersey Order striking Ms. Gordon's answer in the foreclosure litigation.  [See ECF 22-1 p24-47; ECF 22-4 p15] New Jersey's foreclosure procedure is a bifurcated system in which orders to strike an answer and/or enter summary judgment by the trial court do not result in final judgment.  Instead, these orders are interlocutory.  New Jersey has a bifurcated foreclosure process whereby the Trial Court first enters an interlocutory order deeming a pleading uncontested pursuant to 4:64(1)(c).  Thereafter the foreclosing plaintiff can move for final judgment pursuant to N.J.Ct.R. 4:64(1)(d).  The second step of the process is where the amount due on the loan is determined, and it is not until entry of judgment is entered pursuant to N.J.Ct.R. 4:64(1)(d)(4) that the foreclosing plaintiff is entitled to a sheriff sale.  The foreclosure defendant does not become entitled to an appeal as a matter of right pursuant to N.J.Ct.R. 2:2-3 until final judgment is entered.  In the underlying foreclosure case, only interlocutory orders were entered prior to the October 7, 2016 dismissal.

filed under New Jersey docket F-019812-14. That lawsuit was dismissed by the state court on October 7, 2016. There was never a final judgment on the merits in the foreclosure lawsuit.

### c. **The Doctrine of Collateral Estoppel is Not Applicable as a Bar to Plaintiff's Claims.**

Collateral estoppel, also known as issue preclusion, prohibits re-litigation of issues addressed in prior litigation when certain criteria are met. "The prerequisites for the application of issue preclusion are satisfied when :'(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment.'" *Burlington N.R.R. v. Hyundai Merchant Marine Co.,* 63 F.3d 1227 (3d Cir. 1995)(quoting *In re Graham*, 973 F.2d 1089, 1097 (3d Cir. 1992).

In this case, the Court need not far to determine the doctrine of collateral estoppel does not apply. There was never a final and valid judgment entered in the New Jersey Superior Court foreclosure litigation. Defendant BANA argues in its brief at page 18-19 that interlocutory orders can trigger collateral estoppel. In doing so, Defendant relies upon the 1991 Third Circuit Court of Appeals case *In re Brown* which dealt with a bankruptcy petition filed a homeowner facing foreclosure.

13

The facts of *In re Brown* are materially distinguishable from the case before this Court.

The facts of *In re Brown* are complicated.  In 1986, facing multiple business debts, Brown's business filed bankruptcy and within the action negotiated a settlement whereby Brown issued three new personal mortgage guarantees and "waived any claims he might have against the bank." *In re Brown* 951 F.2d 564, 566 (3d Cir. 1991).  Brown's business failed to uphold its obligation and in 1988 the bank filed to foreclose on two of the mortgages issued by Brown.  Id.  The Browns filed an answer and asserted four affirmative counterclaims.  The state court entered summary judgment in favor of the bank and struck Brown's affirmative defenses and counterclaims.  The Court explains "Soon thereafter, the bank submitted a certification of the amount due.  The Browns requested a hearing on that issue, in part because of an assertion that the bank did not adequately account for the proceeds of the Repro [business] collateral liquidation." Id.  Before the hearing took place in state court, Mrs. Brown filed a personal Chapter 11 bankruptcy petition in which identical claims were asserted in an effort to invalidate the mortgage interest of the creditor to those asserted within the state court litigation.  The Court of Appeals found that because the claims asserted before both courts were identical, and one court had already heard the claims and issued findings

14

that remained in place, the doctrine of collateral estoppel
applied.

Before this Court, the facts do not mimic those of *In re
Brown*. Any interlocutory orders of the Superior Court of New
Jersey entered in the foreclosure case are non-binding on the
parties subsequent to the October 7 dismissal of the foreclosure
lawsuit. Moreover, unlike *In re Brown*, Gordon did not raise any
of the affirmative claims before this Court in the foreclosure
lawsuit. There was never a determination of Ms. Gordon's rights
asserted herein, by another Court of competent jurisdiction.
Accordingly, the doctrine of Collateral Estoppel does not apply.

d. **The Entire Controversy Doctrine is Not Applicable as a
Bar to Plaintiff's Claims.**

Plaintiff's claims are not barred by the Entire Controversy
Doctrine. The doctrine imposes mandatory joinder of claims in
certain circumstances and imposes a bar on later assertion of
claims not brought in the original litigation. Here, the
doctrine is inapplicable. In 2015 the Third Circuit Court of
Appeals described the core of the doctrine as follows:

> We have described the entire controversy doctrine as
> 'New Jersey's specific, and idiosyncratic, application
> of traditional res judicata principles' *Rycocline
> Prods., Inc. v. C&W Unlimited,* 109 F.3d.883, 886 (3d
> Cir. 1997). A mainstay of New Jersey civil procedure,
> the doctrine encapsulates the state's longstanding
> policy judgment that 'the adjudication of a legal
> controversy should occur in one litigation in only one

15

court.' *Codgdell v. Hosp. Ctr. At Orange,* 116 N.J. 7 (N.J. 1989).

*Ricketti v. Barry* 775 F.3d 611, 613 (3d Cir. 2015)

New Jersey's entire controversy doctrine as set forth under N.J.Ct. Rule 4:30A has no application to this case because the broad spectrum of the doctrine does not apply to foreclosure litigation. Foreclosures are subject to an independent joinder rule.

> **Rule 4:64-5.  Joinder of claims in foreclosure**
>
> Unless the court otherwise orders on notice and for good cause shown, **claims for foreclosure of mortgages shall not be joined with non-germane claims against the mortgagor or other persons liable on the debt**. Only germane counterclaims and cross-claims may be pleaded in foreclosure actions without leave of court. **Non-germane claims shall include, but not be limited to, claims on the instrument of obligation evidencing the mortgage debt, assumption agreements and guarantees**. A defendant who chooses to contest the validity, priority or amount of any alleged prior encumbrance shall do so by filing a cross-claim against that encumbrancer, if a co-defendant, and the issues raised by the cross-claim shall be determined upon application for surplus money pursuant to *R.* 4:64-3, unless the court otherwise directs.
>
> *N.J. Ct. R.* 4:64-5. (emphasis added)

Chief Justice Jerome B. Simandle provided his interpretation of N.J.Ct. R. 4:64-5 in a 2015 decision in the case of *Sarlo v. Wells Fargo Bank, N.A.* 2015 U.S. Dist. LEXIS 36358 (D.N.J. March 23, 2015) [**Exhibit 2**]

Plaintiffs' claims in this case are not germane within the meaning of *Rule* 4:64-5 and consequently are not barred by the entire controversy doctrine. **The claims in this case — including breach of contract, negligent representation, breach of good faith and fair dealing, fraud, and slander of credit — arise entirely out of Defendant's alleged promise in 2009 to provide a loan modification. By contrast, the subject of the foreclosure action was whether Plaintiffs had fulfilled their obligations under the 2003 mortgage contract.** That question is separate from whether Defendant made a new loan offer in 2009 that Plaintiffs accepted and relied upon to their detriment. Although Plaintiffs' actions, in relying upon Defendant's promise of a loan modification, contributed to the foreclosure, "[a] causal relationship between the two sets of claims is not conclusive under New Jersey Law" to bar litigation under the entire controversy doctrine. *Fields v. Thompson Printing Co.*, Inc., 363 F.3d 259, 266 (3d Cir. 2004). Plaintiffs' claims in this suit — and <u>the asserted damages arising out of the failure to provide a loan modification — have little to do with the enforceability of the 2003 mortgage contract</u>. Plaintiffs' claims are therefore not barred by the entire controversy doctrine.

*Id.* at 15-16. (Emphasis added).

Following Judge Simandle's interpretation of the law, there is no question the Entire Controversy Doctrine does not apply to this case. In *Sarlo*, Judge Simandle reached his conclusion noting that prior to the filing of the district court lawsuit Wells Fargo filed a foreclosure action. "On September 3, 2009, the Superior Court of entered default judgment in favor of Defendant Wells Fargo. The action is presently stayed in the Office of Foreclosure pending resolution of this case." Id. At 10. For Ms. Gordon, the underlying foreclosure lawsuit is not

even pending before the Superior Court of New Jersey following the October 7 dismissal. The existence of the dismissal is even more persuasive that application of the entire controversy doctrine cannot apply herein. There has been no final result ion of the state court action and even if Ms. Gordon wanted to assert the claims before this court in the foreclosure, she could not seek to amend that pleading since the state foreclosure action has been dismissed.

### III. **PLAINTIFF'S COMPLAINT SETS FORTH A CLAIM FOR RELIEF FOR BREACH OF CONTRACT.**

To plead breach of contract a party must allege the existence of an offer, acceptance, consideration, breach and causally related damages. *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992); *See also*, *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007) Plaintiff's complaint sets forth sufficient facts as to each of the four defendants to establish a breach of contract claim for the purposes of the motions before the court.

**The Offer:**

In December 2009 BANA provide Plaintiff with a written HAMP trial period plan contract (hereinafter "HAMP TPP"). [ECF Doc 19 First Am Comp ¶58; Exhibit 4 to First Am Complaint ECF Doc 19-1 p37-45] The HAMP TPP contract required Plaintiff to make

three payments in the amount of $1,614.17, to make certain representations and maintain them as true, and to waive certain legal rights.

**The Acceptance:**

Plaintiff accepted the HAMP TPP, signed the document and returned it to BANA in the manner and time required. [ECF Doc 19 First Am Comp ¶61] Plaintiff took all required steps to accept the HAMP TPP including the making of timely trial payments. [Id. ¶62-64] At all relevant times Plaintiff's representations as required by Section 1 of the HAMP TPP remained true in all material respects. Id. ¶92. Plaintiff agreed to waive rights required by the HAMP TPP.

**The Consideration:**

As a condition of being provided the HAMP TPP, Plaintiff made a one time payment of $2,956.10 to BANA. [ECF Doc 19 First Am Complaint ¶51-53 Thereafter in connection with the HAMP TPP Plaintiff provided monetary consideration to Defendant by making three payments of $1,614.17. [ECF Doc 19 First Am comp ¶64; Exhibits 5-7 to First Am Complaint ECF Doc 19-1 p47-53] When the trial period ended, Plaintiff continued to make additional payments in furtherance of the HAMP TPP. In total Plaintiff paid $15,597.22 as consideration for the HAMP TPP.

Plaintiff tendered additional non-monetary consideration by making representations under oath and against risk under penalty

of perjury. The representations included waivers of legal rights wherein Plaintiff was obligated to affirm "(i)I am either in default or believe I will be in default under the Loan Documents in the near future, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future." [ECF Doc 19-1 p43] Plaintiff also waived legal as consideration for the HAMP TPP by acknowledging the full force and effect of the original loan documents. Id. P45.

During the period of time in which BANA continued to accept Plaintiff's HAMP TPP, BANA upheld its pledged consideration by not taking steps to pursue a foreclosure debt collection lawsuit. [Id. P44]

Consideration is a broad concept in New Jersey. In *Block v. Seneca Mortg. Servicing* 2016 U.S. Dist. LEXIS 150380 (D.N.J. Oct 31, 2016) the District Court determined that adequate consideration had been alleged by the plaintiff in a breach of trial modification case. The facts of *Block* are similar to those before this Court. Block made a down payment, trial payments, and waived rights in connection with entering into the trial modification agreement. The Court explained as to the waiver of rights that "Plaintiff's forfeiture of such valuable legal rights can be sufficient consideration for a new

contract." Id. At *23 *See also In re Cent. R. Co. of N.J.* 163
F.2d 44, 51-52 (3d Cir. 1947).

**The Breach:**

The complaint alleges that Plaintiff complied with all
obligations under the HAMP TPP and Defendant did not comply with
its obligations under the HAMP TPP. Plaintiff signed the HAMP
TPP and returned it to BANA in the manner and time required.
[ECF Doc 19 ¶61]   During all relevant times, Plaintiff's
representations as made under Section 1 of the HAMP TPP remained
true. Id. ¶62.   Plaintiff made each of the required monthly
payments under the HAMP TPP on time *and* continued to make
additional payments to Defendant.  Id. ¶63-64, 67.  Plaintiff
met each of the conditions of compliance with the HAMP TPP and
her financial circumstances did not materially change during the
period of the HAMP TPP. Id. ¶65  Pursuant to the agreement,
Plaintiff was entitled to a permanent modification upon
completion of the HAMP TPP.  The agreement states:

> **If I comply with the requirements in Section 2 and my
> representations in Section 1 continue to be true in
> all material respects, the Servicer will send me a
> Modification Agreement for my signature which will
> modify my Loan** Documents as necessary to reflect this
> new payment amount and waive any unpaid late charges
> associated with overdue loan payments remaining unpaid
> as of the date immediately before the modification.
> [ECF 19-2 p45 (emphasis added)]

The June 3, 20010 formal denial for a permanent HAMP
Modification issued by BANA constituted a breach of the HAMP TPP

agreement.  The June 3 letter denies Plaintiff for a permanent
HAMP Modification based on an alleged "Excessive Forbearance".
The document states that Plaintiff is ineligible "because we are
unable to create an affordable payment equal to 31% of your
reported monthly gross income without changing the terms of your
loan beyond the requirements of the program." [ECF 19 ¶70; ECF
19-1 p55]  "Excessive Forbearance" is not a basis for denying
Plaintiff a permanent Modification under the terms of the HAMP
TPP. [ECF 19 ¶72]  The June 3, 2010 letter constitutes a breach
of the HAMP TPP. [ECF 19 ¶100] Defendant BANA breached the terms
of the HAMP TPP contract when it wrongly denied Plaintiff a
permanent modification.

**The Damages:**

As a result of BANA's conduct Plaintiff suffered damages
including payment of $15,597.22 provided in consideration for
the HAMP TPP. [ECF 19 ¶67]  Plaintiff's damages also include
counsel fees, costs of suit, time lost from work communicating
with BANA in an attempt to comply with the HAMP TPP and to
enforce the HAMP TPP and right to a permanent modification, as
well as damage to Plaintiff's credit resulting from BANA's
breach. [ECF 19 ¶107]  New Jersey recognizes broad categories of
damages on breach of contract claims involving mortgage loan
modifications.  *See Block v. Seneca Mortg. Servicing* 2016 U.S.
Dist. LEXIS 150380 (D.N.J. Oct 31, 2016); *Giordano v. Saxon*

22

*Mortg. Servs., Inc.,* 2014 U.S. Dist. LEXIS 137703 (D.N.J. Sep 29, 2014); *Sarlo v. Wells Fargo Bank, N.A.* 2015 U.S. Dist. LEXIS 36358 (D.N.J. March 23, 2015).  Given the wide support of case law, the Court should deny the Defendants' motion and sustain the cause of action.

IV. **PLAINTIFF'S COMPLAINT SETS FORTH A CLAIM FOR RELIEF FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

Plaintiff sets forth a claim for Breach of the implied covenant of good faith and fair dealing under Count III of the First Amended Complaint.  The claim explains that BANA made misrepresentations to Plaintiff in bad faith that resulted in a breach of the covenant.  The allegations in part state the following:

> 115.  BANA made methodical, intentional misrepresentations which it knew would cause and result in financial damages to Plaintiff, Lauri Gordon.
> 116. These misrepresentations constituted a breach of duty of good faith and fair dealing as to Note and Mortgage in which Plaintiff, requested or inquired about a HAMP modification.
> 117.  The misrepresentations induced Plaintiff to refrain from paying her mortgage payment, causing late fees and penalties under the Note and Mortgage.
> 118.  BANA then deposited $15,597.22 of Plaintiff's money she was induced to pay as Trial Payments and applied those payments to late payment fees and additional interest Plaintiff would have never incurred but for the misrepresentations by BANA.
> 119.  BANA deposited $15,597.22 of Plaintiff's money but failed to timely apply the funds Plaintiff's

> account in accordance with the terms of the Note and
> Mortgage.
> …
> 121. This breach [of] duty of good faith and fair
> dealing proximately caused damages to Plaintiff, Lauri
> Gordon.
> 122. The wrongful actions of BANA were conducted on
> behalf of Fannie Mae. As principal, Fannie Mae is
> liable for the wrongful conduct of BANA.
> 123. The wrongful conduct described herein is non
> exhaustive and it is anticipated that additional
> wrongful conduct sounding in fraud will be uncovered
> during discovery.
> 124. These damages to Plaintiff include but are not
> limited to the value of her time spent gathering and
> sending documents to BANA when the Bank had no
> intention of reviewing them, the cost of sending
> document to BANA when the Bank had no intention of
> reviewing them and the misapplication of funds paid to
> BANA late fees, penalties and interest.

[ECF 19]

Every contract in New Jersey is accompanied by an implied covenant of good faith and fair dealing. *Wood v. New Jersey Mfrs. Ins. Co.,* 206 N.J. 562 (N.J. 2011); *Sons of Thunder, Inc. v. Borden, Inc.* 148 N.J. 396 (N.J. 1997). "Courts imply a covenant of good faith and fair dealing in order to protect one party to a contract from the other party's bad faith misconduct or collusion with third parties where there is no breach of the express terms of the contract." *Kapossy v. McGraw-Hill*, 921 F.Supp. 234 (N.J.D.C. 1996). It is the purpose of the covenant of good faith and fair dealing to ensure that "neither party shall do anything which will have the effect of destroying or

injuring the other party to receive the fruits of the contract." *Wood v. New Jersey Mfrs. Inc. Co.,* 21 A.2d 1131, 1140 (NJ 2011).

The alleged conduct of the Defendants establishes a claim for breach of the implied covenant of good faith and fair dealing. Plaintiff has also satisfied the burden to allege a bad faith motive. *See Wilson v. Hess Corp.*, 773 A.1121, 1130 (N.J. App. Div. 2001). The bad faith motive for BANA is specified by Plaintiff within paragraphs 7-38 of the First Amended Complaint. The motive was profit. As an agent for Fannie Mae, BANA induced Plaintiff to default on the mortgage loan under the false premise that loss mitigation options were *only* available upon default and that such options would be made available upon default. When Plaintiff defaulted, BANA again induced Plaintiff to enter into the HAMP TPP without ever intending to permanently modify the loan. Finally, BANA wrongfully denied Plaintiff for the permanent loan modification by issuing a denial for an invalid cause "excessive forbearance." BANA and Fannie Mae together then when ton to prosecute a foreclosure action seeking to take Plaintiff's home. The filing of the foreclosure was only possible after Plaintiff was induced to default on the loan and wrongfully denied for loss mitigation options. Overall, Defendants deprived Plaintiff the right to receive the fruits of the contract and in the process Defendants violated the covenant of good faith and fair

dealing.   *See Kalogeras v. 239 Broad Ave., LLC* 202 N.J. 349 (N.J. 2010).

V.   **PLAINTIFF'S COMPLAINT SETS FORTH A CLAIM FOR RELIEF FOR VIOLATION OF THE CONSUMER FRAUD ACT.**

Count IV of the complaint sets forth a claim for relief under the New Jersey Consumer Fraud Act N.J.S.A. §§ 56:8-1 *et seq*. The CFA "provides a private cause of action to consumers who are victimized by fraudulent practices in the marketplace." *Gonzalez v. Wilshire Credit Corp.,* 207 N.J. 557, 576 (2011). Courts are instructed that the CFA is "applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud. *Lemelledo v. Benefit Mgmt. Corp.,* 150 N.J. 255, 264 (1997). To establish a claim for relief under the CFA a Plaintiff must allege three elements: (1) unlawful conduct by the defendants, (2) an ascertainable loss on the part of the plaintiff, and (3) a causal nexus between the "method, act, or practice declared unlawful" and the consumer's "ascertainable loss." *New Jersey Citizen Action v. Schering* 367 N.J. Super. 8, 12-13, 842 A.2d 174 (App. Div. 2003). The Complaint clearly sets forth facts to establish all three elements.

The Consumer Fraud Act defines "unlawful practices as:

> [T]he use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment,

> suppression, or omission of any material fact
> with intent that others rely upon such
> concealment, suppression or omission, in
> connection with the sale or advertisement of any
> merchandise or real estate, or with the
> subsequent performance of such person as
> aforesaid, whether or not any person has in fact
> been misled, deceived or damaged thereby.

N.J.S.A. 56:8-2

The relevant terms of art in the Consumer Fraud Act itself have been extensively litigated and thoroughly defined.

> The term 'advertisement' is defined, in relevant
> part, as 'the attempt… to induce directly or
> indirectly any person to enter or not enter into
> any obligation or acquire any title or interest
> in any merchandise or to increase the consumption
> thereof or to make any loan. 'N.J.S.A. 56:8-1(a)

*Laughlin v. Bank of Am., N.A.,* 2014 U.S. Dist. LEXIS 79441, 14 (D.N.J. June 11, 2014).

The New Jersey Supreme Court has found that "collecting or enforcing a loan, whether by the lender or its assignee, constitutes the 'subsequent performance' of a loan, an activity falling within the coverage of the CFA." *Gonzalez v. Wilshire Credit Corp.,* 207 N.J. 557, 577-8 (2011).

In *Gonzalez*, the issue before the Court was whether a post judgment agreement to modify a loan was covered by the CFA. The Court held that it was a covered transaction and noted that a modification of a loan constitutes a "stand-alone extension of credit". *Id*. at 586    The *Gonzalez* Court went on to write a scathing opinion finding that "[l]ending institutions and their

27

servicing agents are not immune from the CFA; they cannot prey on the unsophisticated, those with no bargaining power, those bowed down by a foreclosure judgment and desperate to keep their homes under seemingly any circumstances." *Id.* at 584.

Relying on *Gonzalez*, New Jersey's District Courts have held that Trial Modification Agreements are covered by the CFA. *See Beals v. Bank of Am., N.A.*, 2011 U.S. Dist. LEXIS 128376, 47-50 (D.N.J. Nov 4, 2011); *Laughlin v. Bank of Am.*, N.A. 2014 U.S. Dist. LEXIS 79441, 12-18 (D.N.J. June 11, 2014); *Jubelt v. United Mortg. Bankers. Ltd.,* 2015 U.S. Dist. LEXIS 84595 (D.N.J. June 30, 2015); *Giordano v. Saxon Mortg. Servs.,* 2014 U.S. Dist. LEXIS 137703 (D.N.J. September 29, 2014).

In *Beals*, the Court discussed *Gonzalez* and then wrote

> The Beals plaintiffs and Grullon had a mortgage with Bank of America, and after they fell behind on payments, the servicer negotiated with them regarding a modified payment plan. Just as the post-judgment agreement was covered under the CFA, so too are the modifications here, which effectively operate as a subsequent performance on the original agreement. Therefore, plaintiffs have properly pleaded an 'unlawful purpose'.

*Beals v. Bank of Am., N.A.*, 2011 U.S. Dist. LEXIS 128376, 49-50 (D.N.J. Nov 4, 2011)

More recently, in *Laughlin* the District Court of New Jersey held that "[t]he loan modification process, from negotiation to the signing of a permanent modification effectively operates as a subsequent performance on the original mortgage." *Laughlin v.*

*Bank of Am.,* N.A. 2014 U.S. Dist. LEXIS 79441, 17 (D.N.J. June 11, 2014). The law is clear and settled, trial modification agreements are covered by the CFA.

Plaintiff's pleading makes clear the particularities of BANA and Fannie Mae's unlawful conduct giving rise tot eh CFA claim. In or about September 2009 BANA acting on behalf of Fannie Mae, told Plaintiff she must default on the mortgage loan to become eligible for a permanent loan modification. [ECF 19 ¶47] Plaintiff relied upon the instruction of the BANA employee representative and defaulted on the mortgage loan to become eligible for the permanent modification. [ECF 19 ¶48] Thereafter in December 2009, BANA acting on behalf of Fannie Mae, told Plaintiff by phone that she was required to make a one-time payment of $2,956.10 to be eligible for a HAMP TPP and permanent modification. [Id. ¶52] Plaintiff made the payment of $2,956.10 twice after BANA falsely claimed to have not received the first check. [Id. ¶53-57] When Plaintiffs received the HAMP TPP, Plaintiffs complied with all terms of the agreement and made each of the required payments in the amount of $1,614.17 which were deposited by BANA. [Id. ¶61-68] BANA denied Plaintiff for the permanent loan modification based upon "Excessive Forbearance" which is not a basis for denial pursuant to the HAMP TPP. Id. ¶70-72. The complaint further articulates the unlawful conduct as follows:

132. The acts of BANA and Fannie Mae prohibited by the New Jersey Consumer Fraud Act include but are not limited to the following:

a. BANA acting on behalf of Fannie Mae induced Plaintiff to default on the mortgage loan by promising that a loan modification would be made available once the loan was three months late, all with the intent of foreclosing on Plaintiff's home regardless of the modification application.

b. BANA and/or Fannie Mae deposited $15,597.22 of Plaintiff's money but failed to apply the funds properly to Plaintiff's account.

c. BANA and/or Fannie Mae induced Plaintiff to enter into a Trial Loan Modification Agreement contract and make payments on the loan modification contract which were not properly credited to the account.

BANA, acting on behalf of Fannie Mae, induced Plaintiff to make payments under the Trial loan Modification Agreement contract by falsely promising that upon completion the loan would be permanently modified.

e. BANA instituted a scheme to avoid its responsibilities under the HAMP Agreement and paid its employees incentives to make material misrepresentations to borrowers to achieve this goal, all in an effort to increase the Bank's profits;

f. BANA's methodical scheme of dishonest representations to Plaintiff concerning the receipt of her HAMP loan modification application documents was a "deceptive" act within the meaning of the CFA as the misrepresentations were deliberate acts to mislead and did in fact mislead her;

g. BANA's methodical scheme of dishonest representations to Plaintiff and other New Jersey residents concerning HAMP applications, the purpose of which was to deceive the Federal Government in order to increase the Bank's profits was "deceptive" and in violation of the CFA;

h. The acts of BANA complained of herein possess the tendency or capacity to mislead, or create the likelihood of deception;

The acts of the Bank complained of herein violate public policy, amount to an inequitable assertion of its power and position, are immoral, unethical, oppressive, unscrupulous, and/or substantially

> injurious to Plaintiff and other New Jersey
> consumers; and
> The actions of BANA complained herein were committed
> willfully.

[ECF 19]

In addition to being tricked into paying $15,597.22, Plaintiff was obligated to waive material rights and make certain admissions to Defendants in connection with the HAMP TPP. [ECF 19-1 p37-39]  Specifically, under Section 1 of the HAMP TPP titled "My Representations", Plaintiff was obligated to certify:

> I am unable to afford my mortgage payments for the
> reasons indicated in my Hardship Affidavit and as a
> result, (i) I am either in default or believe I will
> be in default under the Loan Documents in the near
> future, and (ii) I do not have sufficient income or
> access to sufficient liquid assets to make the monthly
> mortgage payments now or in the near future;

[ECF 19-1 p37]

Plaintiff was the victim of an act of consumer fraud when Defendants induced Plaintiff to pay $15,597.22 and waive material legal rights without providing Plaintiff the promised benefit of the bargain and instead moving to take her home through unconscionable means.

The argument of the Defendants that Plaintiff has failed to plead an ascertainable loss must be rejected.  The CFA requires the plaintiff to "demonstrate a loss attributable to conduct made unlawful by the NJCFA, which is quantifiable or measurable,

and not merely hypothetical or speculative." *Jubelt v. United Mortg. Bankers, Ltd.* 2015 U.S. Dist. LEXIS 84595 (D.N.J. June 30, 2015) Plaintiffs exceedingly satisfied the standard.

Faced with a similar fact pattern, the Court in *Giordano v. Saxon Mortg. Servs.*, 2014 U.S. Dist. LEXIS 137703 (D.N.J. September 29, 2014) held

> Plaintiffs have alleged ascertainable loss as either (1) the difference between money spent to obtain a permanent modification and the difference in value between their applied-for permanent modification and the value of the loan they have now, or (2) the difference in value between their applied-for permanent modification as of the Modification Date and the cost of payments they continued to make once the Modification Effective Date Passed. To survive Rule 9(b), Plaintiffs need not plead the exact dollar amount of their loss. Instead plaintiffs must provide enough specificity to give defendants notice of their possible damages. The allegations provide enough specificity to give Saxon notice of Plaintiff's damages.

*Id.* at 14-15 (internal citation omitted)

In *Jubelt v. United Mortg. Bankers, Ltd* 2015 U.S. Dist. LEXIS 84595 (D.N.J. June 30, 2015), the ascertainable loss pleaded by the plaintiff consumer was even more vague in *Giordano* yet upheld as sufficient to sustain a claim. The *Jubelt* plaintiff merely alleged to have "suffered ascertainable losses included but not limited to service fees related to the refinanced mortgage to which Plaintiff was ineligible, paid interest on the refinance mortgage to which Plaintiff was

32

ineligible, any and all costs related to the foreseeable refinancing, consequential damages, and cost of attorney fees." *Id.* at 32.

Here, Plaintiff has provided sufficient specificity to place Defendants on notice of the Plaintiff's damages. The Complaint states:

> 135. As a result of the unconscionable conduct by BANA and/or Fannie Mae, the Plaintiff has suffered injury including but not limited to ascertainable losses consisting of monetary loss in the form of late fees and interest caused by BANA's misrepresentations, damage to credit score, loss of value of her time spent gathering and sending documents to BOA when the Bank had no intention of reviewing them, the cost of sending documents to BOA when the Bank had no intention of reviewing them and the misapplication of funds paid to BANA to late fees, penalties and interest.
>
> [ECF 19 ¶135]

The pleading satisfies the standard required by the Courts. Recently, District Court Judge Freda L. Wolfson provided a detailed analysis of the ascertainable loss issue explaining:

> With respect to the second prong- 'ascertainable loss'- the plaintiff must "demonstrate a loss attributable to conduct made unlawful by the [NJ]CFA," which is "quantifiable or measurable," and not merely "hypothetical" or "speculative." *Thiedmann v. Mercedes-Benz USA, LLC* 183 N.J. 234, 246-52, 872 A.2d 783 (2005). However, plaintiffs "need not plead the exact dollar amount of their loss. Instead, plaintiffs must provide enough specificity to give defendants notice of their possible damages." *Giordano,* 214 WL 4897190, at *6 (internal citations omitted). The damages for Plaintiff's NJCFA claim are the same as those set forth for the underlying breach

of contract claim. It is plain that Defendants have been put on notice of Plaintiff's claimed damages."

Block v. Seneca Mortg. Servicing, 2016 U.S. Dist. LEXIS 150380 at *84

Plaintiff has satisfied her burden by making clear within the complaint the unlawful conduct of the Defendants, Plaintiff's ascertainable loss, and the causal relationship between the two. Accordingly, the Court should sustain the Consumer Fraud Act claim against BANA and Fannie Mae and permit the case to proceed on the merits.

## VI.   **PLAINTIFF'S COMPLAINT SETS FORTH A CLAIM FOR RELIEF FOR VIOLATION OF COMMON LAW FRAUD.**

Plaintiff's pleading sets forth all of the elements to establish a claim for common law fraud. "The five elements of common law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Indian Brand Farms, Inc. v. Novartis Crop Prot., Inc.*, 617 F.3d 207, 210 (3d Cir. 2010) (*quoting Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 610 (N.J. 1997).

Contrary to Defendants' argument, Plaintiff has set forth the requisite specificity to sustain a cause of action on a motion to dismiss. For the sake of judicial economy, Plaintiff

34

directs the Court to review the misrepresentations of Defendants as explained in Section V of this brief addressing Plaintiff's New Jersey Consumer Fraud Act Claim.

Unlike the New Jersey Consumer Fraud Act, a claim for common law fraud requires demonstrating that the Defendant offender knew the statements made were false. Paragraphs 19-38 of the complaint set forth the basis for BANA's knowledge that the statements made were false *and* that BANA intended for Plaintiff to rely upon them. The pleading explains that BANA "chose to develop methodical business practices designed to intentionally prevent scores of eligible homeowners from becoming eligible or staying eligible for a permanent HAMP modification." [ECF 19 ¶22] The complaint incorporates sworn testimony from BANA employees explaining the nature of the complex fraud.

> **31.** According to the June 5, 2013 Declaration of William E. Wilson, Jr., who worked for BANA in Charlotte, North Carolina from 2010 through 2012:
> …
> **c.** Bank of America instructed its employees to employ a common strategy of delaying HAMP applications, "claiming that documents were incomplete or missing when they were not, or simply claiming the file was 'under review' when it was not." This delay tactic allowed BANA to falsely claim homeowners had not provided the required documentation hen in fact, the homeowner had sent in documents months earlier, often multiple times and had made payments under a Trial Payment Period plan, but had not gotten a permanent modification or even a decision regarding their modification.

**d**. Next, BANA regularly employed a procedure called a "blitz." "Approximately twice a month, BANA ordered case managers and underwriters 'clean out' the backlog of HAMP applications by denying any file in which the financial documents were more than 60 days old. These included files in which the homeowner had provided all required financial documents and fully complied with the terms of a Trial Period Plan" and were entitled to a HAMP modification.

….

**32.** According to the May 23, 2013 Declaration of former BANA Senior Collector of Loss Mitigation employee, Simon Gordon:

**a.** Employees were given quotas for placing a specific number of accounts into foreclosure, including accounts in which the borrower fulfilled a HAMP Trial Period Plan. Employees who met the quota for placing "ten or more accounts into foreclosure in a given month received a $500 bonus. Bank of America also gave employees gift cards to retail stores like Target or Bed Bath and Beyond as rewards for placing accounts into foreclosure."

…

**c.** "Employees who were caught admitting that BANA had received financial documents or that the borrower was actually entitled to a permanent loan modification were disciplined and often terminated without warning."

**33.** According to the May 15, 2013 Declaration of former BANA collection employee, Theresa Terrelonge:

…

**b.** BANA employees "were called into group meetings with our supervisors on a regular basis. The information we received in group meetings showed me that Bank of America's deliberate practice was to string homeowners along with no intention of providing permanent modifications. We were instructed to inform every homeowner who called in that their file was "under review" – even where the computer system showed that the file had not been accessed in months or when the homeowner had been rejected for a modification."

…

**c.** She "witnessed employees and managers change and falsify information in the systems of record, and remove documents from homeowners' files to make the account appear ineligible for a loan modification.

36

> This included falsifying electronic records so that
> the records would no longer show that the homeowner
> had sent in the required documents or had made
> required payments.  This was done so that the file
> could be closed, the homeowner's effort to obtain a
> loan modification could be rejected, and the manager
> could meet Bank of America's production goal for the
> given week or month."

BANA told Plaintiff that she could only obtain loss mitigation assistance if she first defaulted on the mortgage loan. [ECF 19 ¶47]  Plaintiff acted in reasonable reliance of the instructions from BANA and defaulted on the mortgage loan *only after being told to do so* by BANA.  Id. ¶48-49.  BANA told Plaintiff falsely that the only way she could obtain a HAMP modification was to make an initial one-time down payment of $2,956.10. [ECF 19 ¶52]  Plaintiff acted in reliance of BANA's instruction and sent BANA a check in the amount of $2,956.10.  Id. ¶53.  BANA falsely claimed to have not received Plaintiff's down payment of $2,956.10 and induced Plaintiff to send a second check in the same amount.  BANA ultimately deposited both $2,956.10 checks.  Id. ¶55-57.  BANA then induced Plaintiff to send additional money under the false representation that Plaintiff was being considered for a permanent loan modification.  Plaintiff complied with all terms of the HAMP TPP and made all required payments.  BANA kept Plaintiff's money and denied Plaintiff a permanent loan modification under an invalid basis that the loan had "excessive forbearance." Id. ¶67-72.  In

addition to this summary of facts, the complaint sets forth specific dates and provides demonstrative support in the form of exhibits that place Defendants on notice of the precise facts giving rise to the fraud.

As to damages, the Complaint is unequivocally clear. Plaintiff's damages include the costs of preparing and delivering the HAMP application BANA had no intention of reviewing or approving. The damages also include incurred fees and penalties following Plaintiff's default on the mortgage loan which was induced by BANA's false representations. Id. ¶85

VII. **PLAINTIFF'S COMPLAINT SETS FORTH A CLAIM FOR RELIEF FOR VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT IN COUNT V OF THE COMPLAINT.**

There are four elements to an FDCPA claim and Plaintiff has met the pleading burden of each element against each defendant. A Plaintiff must allege "(1) [she] is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Douglass v. Convergent Outsourcing*, 756 F.3d 299, 303 (3d Cir. 2014). In this case, Plaintiff has alleged all of these elements as to Seterus. Accordingly, the motion to dismiss should be denied.

38

Congress enacted the FDCPA in 1977 "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. 1692(e). Congress noted that such abusive debt collection practices contribute to the number of personal bankruptcies, marital instability, the loss of jobs, and invasions of individual privacy. *Douglass v. Convergent Outsourcing*, 765 F.3d 299 (3d Cir. 2014), *citing* 15 U.S.C. §1692(a); *see also Lesher v. Law Offices of Mitchell N.Ka, P.C.*, 650 F.3d 993, 996 (3d Cir. 2011); *Evankavitch v. Green Tree Servicing, LLC* 2015 U.S. App. LEXIS 12024 (3d Cir. July 13, 2015). It is against this backdrop that Plaintiff seeks relief before this Court.

The Complaint satisfies the first element of the FDCPA by alleging that "Plaintiff is a consumer as that term is defined by 15 U.S.C. §1692a(3)". [ECF 19 ¶139] The FDCPA defines "consumer" as "any natural person obligated or allegedly obligated to pay any debt." 15 U.S.C. §1692a(3). The Complaint sets forth specific facts establishing that Plaintiff is a natural person under obligation to pay a debt.

The Complaint satisfies the second element of the FDCPA by alleging Seterus is a debt collector. [ECF 19 ¶140] As an

entity that became loan servicer in relation to the Plaintiff after the debt went into default, Seterus is a debt collector. Congress defined "debt collector" to be any entity "in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. §1692a(6).

The Court must consider in reviewing the Plaintiff's claims for violation of the FDCPA, that such claims are viewed objectively from the perspective of the least sophisticated consumer. *Kaymark v. Bank of America, N.A.* 783 F.3d 168, 174 (3d Cir. 2015). Using this standard, the Court is directed to inquire whether the allegedly false or misleading statement "has the potential to affect the decision-making process of the least sophisticated debtor; in other words, it must be material when viewed through the least sophisticated debtor's eyes." *Jensen v. Pressler & Pressler* 791 F.3d 413, 421 (3d Cir. 2015) Furthermore, the "FDCPA is a strict liability statute to the extent it imposes liability without proof of an intentional violation." *Allen ex rel. Martin v. LaSalle Bank, N.A.* 629 F.3d 364, 368 (3d Cir. 2011)

Seneca is alleged to have violated 15 U.S.C. §1692e which broadly prohibits the use of false, deceptive, and/or misleading statements in connection with the collection of a debt. The

40

Complaint satisfies the third and fourth elements of pleading a claim for relief under the FDCPA against Seneca because "the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and … the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Douglass v. Convergent Outsourcing*, 756 F.3d 299, 303 (3d Cir. 2014)

Plaintiff's claim arises out of a letter dated February 18, 2016 sent by Seneca to Plaintiff. [ECF 19-1 p77-85] That letter is a "communication" defined by the FDCPA as "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. §1692a(2). Through use of a communication, Seneca employed the use of "false, deceptive, or misleading representation or means in connection with the collection of any debt" in violation of 15 U.S.C. §1692e.

Courts in the Third Circuit have routinely held mortgage loan statements and letters instructing a debtor how to make payment are debt collection communications. *See Langley v. Statebridge* 2014 U.S. Dist. LEXIS 176266 (D.N.J. Dec. 16, 2014); *Block v. Seneca Mortg. Servicing* 2016 U.S. Dist. LEXIS 150380 (D.N.J.. Oct 31, 2016) at *60-62. In *Block*, the District Court provides a thorough analysis of the law on this area.

41

The law of the Third Circuit concerning the monthly
statements sent by Defendants, however is much more
favorable to Plaintiff.   In *McLaughlin v. Phelan
Hallinan & Schmieg, LLP*, the Third Circuit held that
"a communication need not contain an explicit demand
for payment to constitute debt collection activity.
Indeed, communications that include discussions of the
status of payment, offers of alternatives to default
and requests for financial information may be part of
a dialogue to facilitate satisfaction of the debt and
hence can constitute debt collection activity." 756
F.3d 240, 245-46 (3d Cir. 2014), *cert. denied,* 135
S.Ct. 487, 190 L. Ed. 2d 360 (2014).   The Court
extended this definition to documents, which, *inter
alia*, "provide [] an invoice-like presentation of the
amount due." *Id.* At 246.   *See also Simon*, 732 F.3d at
265-66 ("Nor can the [defendant's] FDCPA claims be
dismissed on the ground that the letter and notice
were not 'communications' under the statute... We
rejected [defendant's] argument and noted that a
communication' need only convey information regarding
a debt and is not limited to specific requests for
payment." (citations omitted)); *Kaymark v. Bank of
Am., N.A.* 783 F.3d 168, 175 (3d Cir. 2015), *cert
denied sub nom. Udren Law Offices P.C. v. Kaymark*, 136
S.Ct. 794, 193 L.Ed. 2d 710 (2016) (applying
*McLaughlin* to find FDCPA applicability where a
communication "plainly inform[ed] the reader of the
specific amounts due for specific items as of a
particular date, ... [Defendant] also did not convey
that the disputed fees were estimates or imprecise
amounts.   Thus pursuant to *McLaughlin*, the Foreclosure
Complaint conceivably misrepresented the amount of the
debt owed, forming a basis for violations of §1692e.

*Block v. Seneca Mortg. Servicing* 2016 U.S. Dist. LEXIS
150380 (D.N.J.. Oct 31, 2016) at *60-632

If the Third Circuit Court of Appeals case law left any doubt as

to whether the February 18 letter is covered by the FDCPA, the

language of the letter eliminates such doubt.   Seterus

specifically states in the letter "THIS COMMUNICATION IS FROM A

DEBT COLLECTOR AS WE SOMETIEMS ACT AS A DEBT COLLECTOR.  WE ARE ATTEMTPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE." [ECF 19 ¶148; ECF 19-1 p77]

Here, Plaintiff Lauri Gordon alleges that the February 18, 2016 letter from Seterus contains charges and demands payments for fees not owed on the loan.  Page 9 of the February 18 letter contains a demand for Plaintiff to pay $390.00 for property inspections including 26 separate inspections that allegedly occurred on April 9, 2015. [ECF 19 ¶149-151; ECF 19-1 p54] Objectively, claiming 26 separate inspections on a single day violates the Fair Debt Collection Practices Act as an abusive action, attempt to collet money not owed, or both.  To the extent the billing is an "error" sufficient to satisfy 15 U.S.C. §1692k(c) that issue will have to be dealt with in discovery.

Lastly, Plaintiff addresses the Defendant's argument that because the February 18 communication was addressed to Plaintiff care of her attorneys, the communication is immune from FDCPA coverage[2].  Factually, the letter is addressed to Lauri Gordon which undermines Defendant's argument.  More importantly, the argument must be rejected because it contradicts Third Circuit case law.  There is a reason Defendant relies exclusively on cases from other Circuits.  In essence, Defendant argues that so

_____

[2] Plaintiff notes that had Seneca sent the communication directly to Plaintiff, Seneca would have been in violation of 15 U.S.C. §1692c.

long as a communication is sent to a consumer's attorney, the information within the letter can be false, deceptive and/or misleading without imposing any liability on the collector. This makes no sense.

Section 15 U.S.C. §1692a(2) does not limit the definition of communication to correspondence sent directly to the debtor, and neither does §1692e of the FDCPA. In *Kaymark,* the Third Circuit Court of Appeals confirmed that a legal pleading meeting the definition of "communication" under the FDCPA is covered by 15 U.S.C. §1692e to the extent the pleading contains false, deceptive, and/or misleading information. *Kaymark v. Bank of Am., N.A.* 783 F.3d 168 (3d Cir. 2015). The ruling makes clear that even communications directed at attorneys, and/or the Court rather than the consumer themselves, are covered by the FDCPA. Defendant's argument in this regard must also be rejected.

<u>CONCLUSION</u>

Plaintiff has gone beyond the minimum standard in setting forth facts together with proofs to allege each count of the Complaint. The Defendants' motions are without any support in fact or law and the motions should be denied.


Dated November 7, 2016               */s/ Adam Deutsch*
                                     Adam Deutsch, Esq.
                                     Denbeaux & Denbeaux
                                     Counsel for Plaintiff

44